Good morning, Your Honors. I'm Juanita Brooks from Fish & Richardson on behalf of Plainton Appellant Raceway Properties. Normally, Your Honors, I wouldn't begin an oral argument by citing black-letter law to the Court. I know the Court has read the briefs and is well familiar with the black-letter law. But in this particular case, because the District Court chose to completely ignore that black-letter law, I'd like to take just a moment to refocus what the issue really is here. What happened in this case is that the District Court dismissed Raceway's complaint with prejudice and without giving it leave to amend. In order to do that, the Court had to, pursuant to the Always case, which is cited actually at Appellee's brief at pages 6 and 58, construe all allegations of material facts in the light most favorable to the non-moving party, i.e. Raceway. The Court went on in Always to say, We will not dismiss a complaint unless it appears beyond doubt that a plaintiff can prove no set of facts in support of his claim which would entitle him to relief. What we have in this case, Your Honors, is a 37-page complaint with a plethora of specific facts that support each of the causes of action, the usury, the fraud, the unfair business practices, and the recode. What the District Court did was begin with the usury and by simply sort of pulling on a thread, assume that the entire case came unraveled. Can you just say in, you know, directly why that was wrong? Assume that the District Court was correct on the usury ruling for the purpose of this question. Then why is it that there are facts alleged that support recovery, not on a usury theory? Your Honor, that's very clear. Under the 17-200, for example, the plaintiffs alleged that LSOF violated the requirements of the finance lender's law. The plaintiffs alleged that there was a creation of a false broker's affidavit, that there was failure to produce that affidavit to Raceway's counsel, that LSOF deliberately waited to retract the joint venture proposal until Raceway's $300,000 had become nonrefundable, that LSOF gave Raceway then only 24 hours to decide whether or not to accept these usurious terms. And as a result of this ---- Well, okay. But you just said usurious terms. Let me take that out. They gave Raceway 24 hours to accept these terms, which but for the exception would be usurious. But take that out. All of these, every single fact that I've alleged, we say is an unfair business practice. The Court didn't address those at all. The Court simply said that because the usury claim was out and because plaintiffs had withdrawn their duress claim, that somehow there was nothing left of the 17-200, when, in fact, what the case law tells us is that it is a fact-intensive inquiry. Whether or not a practice is unfair can only be determined by looking at all of the facts in the particular transaction. And in this case, what we have alleged starting at paragraph 26 of the complaint and running through paragraph 77, which aren't even the usury cause of action, those are the general allegations, is a classic scheme to bait and switch and prevent Raceway from being able to do anything other than ---- Would you allege, then, that the bait and switch wasn't just by the imposition of usurious rate of interest, but rather that it was just switched to a loan? I mean, is that your theory? Our theory is that it was switched to a loan that had very onerous terms. Whether technically usurious or not, it was a loan that had extremely onerous terms, which Raceway never would have entered into but for the barrel that they found themselves over. And in addition, in paragraph 53 of the complaint, we allege, and it's right there in the agreements, that there was a no-shop condition. So here you have essentially a borrower that has utterly no choice. They thought they were entering into a joint order. Well, see, the odd thing about it, and this doesn't go to the 12b-6, and I recognize this, but maybe it would help if you would say why. The odd thing is that, of course, they had all the choice in the world. They knew the affidavit was false. I mean, they clearly knew it was false. If it were false, they knew it was false before they signed it. So I don't know where that gets you. And you could have just said time out. We're not going there. We've lost $300,000, and we're going to hold you accountable for it. End of it. 20-20, hindsight is always 20-20, Your Honor. Well, but you know what? That isn't even 20-20, and I guess it doesn't have anything to do with 12b-6. That's true. But I guess I just the theory just is difficult to swallow, and I think that influenced the district court a good deal. You know, Your Honor, you may be absolutely right, and there may have come a day when a finder of facts said, you know what, a pause on both your houses, and I'm sorry, we're just not going to go along with you. But that's not the standard for determining whether or not a motion to dismiss should be granted. Raceway should have been given its day in court. Okay. You've discussed the unfair competition or unfair trade practices, whatever they call it now. What about fraud? Fraud, Your Honor, if I go to paragraph 22 of our complaint, in addition to all of the general allegations, which are starting at paragraph 26 and running through paragraph 77, if I go to page 22 of the complaint, it is alleged in paragraphs 114, 115, 116, 117, what the fraudulent acts were, that there were representations made by the defendants, i.e., let's do a joint venture agreement. We're with you, Raceway. This is going to be a great deal. You and us together, we're partners. And that these were, in fact, false representations. The defendants knew they had no intention of honoring their commitment to participate in a joint venture project, and that they fully intended to convert this at the last second when Raceway had no opportunity to get out into this owner's loan. Okay. That makes out the fraud allegations. But, I mean, the district court said that it didn't, the fraud allegations didn't survive because it was based on a conspiracy theory. That's correct, Your Honor. What the district court did there was once again make a factual finding against Raceway from the facts that were stated in the complaint, rather than, as the law requires, making a factual finding in favor of Raceway. What the court did was pick its own overt act as being the last overt act in the paragraph 121. I mean, so that's your allegation, that the last overt act was the date of the credit bid. And the district court said, if your theory is bait and switch, then the switch occurred in March of 98, I believe, not in December 02, with the credit bid. But if your theory is a different theory, that's what I'm trying to figure out. I don't understand what the conspiracy was and what it was to accomplish. It's not alleged. The conspiracy was exactly what happened. Begin with the bait and switch. A conspiracy has to start somewhere. How are we going to, we, LSOF, going to end up wrongfully with Raceway's property? How are we going to do that? That's the conspiracy. The object of the conspiracy is to get the property. The object of the conspiracy is to get the property. Well, it's a dead gun, this complicated, convoluted way to get it. To assume that two years down the pike, somebody's going to go into bankruptcy and that a court's going to rule in favor of their plan and they have to credit bid in and stuff. But anyway, if that's your theory. We can't read LSOF's mind. We can only look at what they did and make inferences from that. Perhaps they didn't care whether they ended up with the property or ended up with a 55 percent interest loan. They may not have cared which way it went. They were going to make out like bandits. And that was essentially their goal, was to make out like a bandit. Whether it be to have the property and sell it at a huge profit or whether to just sit back while Raceway spent its last pennies trying to pay this 55 percent interest. We don't know. They haven't told us. But what we do know is they did the bait and switch and they did end up with the property when all was said and done. And so the last overt act of that conspiracy, we say, is when they did the credit bid. Again, whether we're right or not and whether a finder of fact will say no, I find the last overt act to have occurred significantly before that. We want our day in court. That's all we're asking for, is an opportunity for somebody to make that decision and not have a district court judge ignore the factual allegations and only pick those that supports the district court judge's view that this cause of action was barred by the statute of limitations. I'd like, if I could, to address very briefly the usury and whether or not since if we go back and find that, indeed, the court was wrong that this exemption applied in this case, then everything else, I assume, goes back into place. And our position is, as Your Honor honed in on very quickly, even if the court was right, all our other causes of action are still valid and should not have been dismissed. But the court was wrong on the usury. What the usury exemption states is, I want to get the words exactly right because it's important, that it could reasonably be assumed that the borrower had the capacity, that's a key word, capacity to protect their own interest in connection with the transaction. All of the allegations in the complaint show a scheme on the part of LSOS to take that capacity away from Raceway in this transaction. Did Raceway in the past have that capacity? We're not saying they didn't. But in this transaction, did they have that capacity? Absolutely not. And we allege, once again, over and over again. Well, it has the capacity, though, doesn't have to do with feeling yourself between a rock and a hard place. The capacity has to do with your knowledge, sophistication, your being counseled, and your understanding of the options that are available to you as you're in the process of negotiating. That's part of the capacity, certainly. But in addition to that, the words, it doesn't end there. It says, in the transaction. So you have to look at all of the facts surrounding this transaction and determine what the borrower's capacity was in this transaction. And I, in a moment, will go on to, and from whose point of view do you look at that? But let's just begin with saying you look at it, as the court believed, even from the court's point of view. What did the court hang its decision on that Raceway had the capacity? One fact, that Raceway had been in the business of real estate development for a long time and had a history of stable relationships with its funding sources. Now, if the court had been following all waste, that fact should be construed in the light most favorable to Raceway, meaning that here you have essentially a business entity that is used to being treated fairly, a business entity that when the other side says, let's enter into a joint venture. Well, yeah, but stuff happens. Okay? Stuff happens. So, I mean, the law wasn't designed to keep bad things from happening. I mean, the law is designed to say, look, if you're sophisticated, if you know what you're doing, if you've got a lawyer, then, hey, if you agree to something, you agree to it. Absolutely. But the question is, and the language is, in this transaction. So it simply can't be, if you have a lawyer, this exemption applies. It would wipe out the exemption. It is very fact specific. And the exemption itself says that in order to interpret the exemption, which is 25118, you look at 25102. And 25102, we have, because we have no case law on 25118. From what perspective do we look at it? What does it mean to have capacity? What does it mean in this transaction? But the statute itself says you look at 25102. And in that case, we have case law. We have the Graham case that says that the determination of whether or not one is a sophisticated consumer or borrower is a question of fact to be measured from the perspective of the offeror. And what does the offeror know in this case? That they had Raceway over a barrel. They set this thing up that Raceway would have utterly no choice. And that, yes, Raceway had counsel. But one of the key pieces of documentation in this case, that false broker's affidavit, the offeror withheld from Raceway's counsel to give them no opportunity to review it. And that the offeror knew at the time, and it's all alleged in the complaint that was dismissed. Your client could have shown it to them, to your own lawyer, and said, hey, they want me to sign something that's not true. What should I do? That they didn't provide it until the last second. They were at the bank. And certainly, Your Honor, as I say, this is all appropriate. At trial, you bet there's going to be a cross-examination of the attorney or of the gentleman that signed the affidavit saying, you could have said, I'm walking out of the bank and I'm going to go see my lawyer. The problem is the clock was ticking. And that deal was going to fall through if they didn't sign it right then and there. They had absolutely no choice. And whether we would win at trial or not is not the standard for whether we get our day in court. We might not prevail, but at least we should be given the opportunity to do so. I would now defer to my co-counsel on the issue of the amending for the attorneys. It will be very brief. Okay. Raymond Robinson. It would please Your Honor for Rachael Ray Properties. In the moments allotted to me, I just wanted to draw the Court's attention to a case that came out last August called Vega, V-E-G-A v. Jones Day, 121 Calap 4th, 282, dealing with the subject of attorney fraud and the fact that attorneys are no more protected from the consequences of committing a fraud or a bad or illegal tortious act than any other person who undertakes to so injure a third party. We have briefed the issue in our brief. We've cited the fact that we rely on the train of events that counsel engaged in that go far beyond the practice of law. And I will quit at that point. Okay. Thank you. All right. Mr. Berger. Good morning. My name is George Berger. May it please the Court, counsel. I'm happy to start by answering any questions that the Court has. Well, yeah. This is a 12B6 motion to dismiss. And as I read the complaint, even if the district court got it right on usury, the complaint doesn't, the fraud allegations, the unfair trade practices allegations, and the RICO allegations do not turn on the loans being usurious. So I just don't understand how you get a 12B6 motion granted. Maybe summary judgment. Maybe. But for purposes of a 12B6, don't you have to say, look, they allege fraud, and it doesn't turn on a usurious rate of interest. It turns on a high rate or it turns on the crunch that they got put into. But it doesn't depend upon its being usurious. Let's assume for purposes of the Court's question that usury is not an issue for this discussion. The law is, of course, and I know this Court knows it well, that we're not stuck with the allegations of the complaint. The complaint had attached to it many, many things, including, for example, the loan documents themselves. I understand that, but I also understand what the district court based its decision on. I understand, and I understand that, too. It also had attached to it the draft letters of intent that Raceway chose to never sign. Now, here comes the law. And the reason why fraud, for example, is not in the case and should not be in the case as a matter of a 12B6, fleeting motion, is because of the law. We have cited to this Court, and I'm going to count them, one, two, three, four, five, six, seven cases, and I can recite them and give the cites if the Court wants, that many cases which hold that an oral promise to enter into a deal like this under the admitted fled facts of this case does not give rise to a cause of action. You know what? I know that law, needless to say. I've read all those documents, and I see your integration clause, and I see your statement that says it. But I don't have any context. And as I said, if you're on a summary judgment and you've got some context there, then maybe I get it, but I'm having an enormous difficulty with a 12B6 when the complaint on its face goes beyond usury. And that's what the district court said undid the complaint. The cases that we cite to the Court on the proposition that, for example, the Mambo del Brasil case, California leading case on integration clauses and their effect, the Copeland versus Baskin-Robbins case, federal cases that look at letters of intent and explain their meaning and so forth, are all cases that arise either on pleading battles or on motions for summary judgment where the only disputed facts are, oh, we thought we had a deal because of what was said before we had a deal, and we'd like to turn three or five or six months back in time, undo what we had, and sue for what was orally under discussion before. All those cases say that a litigant, a civil claimant, can't do that. And as to fraud, as to fraud, let's examine the facts as pled on that. The fraud is at one time there was discussion of a joint venture. In fact, our side offered letters of intent for a joint venture. The other side did not sign them. But, see, the problem is, I don't, I mean, I hear your representation. I certainly don't doubt that that's all how it came down. I mean, I'm not doubting your statements. But that requires getting in and fussing with the facts. That was all pled. What I just said was all pled. Well. And those letters of intent that were unsigned and the letter of intent that was signed were all attached to the complaint. Yes. And I have no idea what they mean. You see, that's the problem. Without your explanation with it, I look at it and I say, yeah, there are a series of documents here, which they've presented, but I have no idea what happened with respect to any of those documents, without an explanation. Let's assume, let's assume the very worst interpretation happened, the most egregious and outlandish explanation happened. Let's assume that, and I'm taking a lot out of, I'm removing a lot from the complaint when I make this assumption. Let's assume Raceway was not a stand-alone entity created by the, and this is all alleged, created by the SunCal group, who had lots of dealings with lots of real estate and whose practice was, and this is alleged, whose practice was to create stand-alone entities per project. Let's assume that's all out of the case and isn't there. Let's assume Raceway is mom and pop who want to do a deal and they want to buy this property. And a prospective lender comes to them and says, we'll join venture with you. And mom and pop really dive into the property. They spend a lot more money on the property. And in reliance on the oral joint venture, they get very excited. They spend tens and hundreds of thousands of dollars getting ready for the property. And on the very last day before they're supposed to buy the property and close, the bank says, we can't do it. We've got to do a loan structure. Mr. Brewer, you know, I hear you. I mean, here's my problem. I know that. The district court didn't go on this theory. And as much as I love being, I personally love being a district judge. That isn't my job now. And the district judge grappled with this and had a ruling. And it had nothing whatsoever to do with integration clauses or trying to figure out how the documents fit in or not. Maybe it's an alternative basis for affirming. I mean, maybe. And maybe to probably or almost certainly you went on summary judgment. But the district court threw out your fraud and RICO, the fraud and RICO claims on the sole ground that the claims of duress and usury had been dismissed. And with respect to the fraud claims to the extent it alleged a conspiracy, that the conspiracy necessarily had to come to a halt with the switch. I would urge the court to look at the entire record from the district court. Before the district court ruled on the dismissal motion, it ruled on the attorney motion, the motion, the statutory motion to add attorneys. And by the way, the attorneys were not added because they supposedly committed independent fraud. They were added because they supposedly were co-conspirators with their clients. That's real clear. The court addressed that motion first and wrote about it first. And in that discussion, the district court explained why there couldn't possibly be a fraud. Now, all those words were not cut and pasted into the dismissal motion. But the thinking of the court is crystal clear. And the district court said words like, when you have your own lawyer, when the loan documents that were signed are very clear, when two weeks before the letter of intent is also clear as to what the loan terms are going to be, then how can there be a fraud? And so, yes, the district court's written decision on the 12B6 motion is very cryptic on whether or not there was a fraud in the basis for dismissing the fraud, RICO, and related claims. But I think it bears looking at the companion decision of the district court regarding the attorney dismissal where the district court explained in some detail what I'm explaining now. There are two matters that I would like to apprise the court of that are by way of update and couldn't have been contemplated by us because we don't get a chance to file a surreply today. One is this. There is, in our brief, a chart on page 18 and a footnote on page 18 with a lot of numbers. First, I want to apologize to the court. The footnote on that page, the number on that page, does not track the footnote page. The actual footnote is on the page before. So footnote 9 of our page 18 actually is crunched together under footnote 8 here. The word processing and people who reviewed it didn't catch that. Second, the record references to the numbers on this table were not stitched into the table. But if the court goes to the complaint, to the supplemental excerpt of record filed by the other side, all the numbers are there and they're exactly there to the penny. And they demonstrate that as to usury, not only was this loan not usurious under the law, it couldn't be usurious factually because the amount of the credit bid didn't even exhaust the hard cash required to pay prior liens. And during the principal current, interest is not implicated in the credit bid as a factual matter. Now the second thing I want to bring to the court's attention is a case that came down yesterday. I don't have a cite for it because it's not even in the advance sheets or in the newspapers, in the daily appellate record. It is called In Re Firearm Cases. It comes out of the California Court of Appeal, First Appellate District. The reason I mention it is because at the over-the-internet version of it on page 15, it begins a discussion of causation and the requirement for causation in unfair competition cases under B&P Code 17-200 at SEC. And it makes clear that causation in the traditional legal sense is very much required in California under the Business and Professions Code, even though there is chance language in some cases that suggests there's not a strict causation requirement under unfair competition law. And applying that case in California law on causation to the unfair competition averments, let me perhaps leave with this thought. Let's suppose all the facts are as planned, except I'm going to add one to illustrate the point. Let's suppose that Raceway had, on March 23, 1998, said, we don't want to do this deal. We don't want to do the joint venture deal. We don't want to do the loan deal. We're going to walk away, as they had the right to do and as the court has noted, no matter how one interprets the complaint or all the attachments to it. Let's suppose Raceway had said, we know Lone Star. You too have invested in due diligence. You've studied this. You've been out here. Our broker member has spent a couple hours showing you around the property, which is pled. You've hired lawyers. You've prepared the documents. You've invested time and money in due diligence and flown out. But we don't want to do the deal. And let's suppose that now, I have to calculate, seven years later, I'm representing Lone Star and I'm saying to the court, as a matter of pleading, we should have gotten past the pleading stage and we should be allowed to prove that Raceway had in mind all along to get us real excited to potentially do a joint venture, to get involved with money and accountants and property reviewers and spend a couple hundred thousand dollars doing our due diligence and then pull the plug. They don't have the right to do that, would be the gist of my argument. And the court, I think correctly so, would say absolutely. Under the cases that talk about letters of intent, under Copeland and Banco de Brazil and all the cases out of California and all the cases we've cited from the federal system, where two knowledgeable, represented clients come together and are contemplating a deal, a business transaction in the range of six to seven to eight million dollars, absolutely either one of them has the right to walk away from it and to change the negotiations until the last minute and to say at the end of it or two weeks before the end of it, I'm sorry, we're changing the structure from a joint venture to a loan. And these are the terms of the loan. You can have them or not, take your pick. And I would submit that by just changing the parties and making Lone Star the one who wanted to do the deal as originally structured and having Raceway say, no, we want to change the structure, take it or leave it, and we've got to close in two weeks, it really demonstrates why there's no case here as a matter of the facts planned. Thank you. Okay, Ms. Brooks. I will just address the two issues that were discussed by the defendant in this case. The seven cases that defendant referred to, we couldn't agree with more. If, in fact, we were trying to enforce an oral contract and that was our cause of action, we would be out of court. That is not what we are asking for. We aren't asking for the joint venture to be put back in place. We are showing the court all of the representations that were made by LSOF, not just in the proposals, the joint venture proposals, but phone calls from LSOF saying that the development board had met and approved the joint venture. And then subsequent phone calls at the 11th hour saying that they had now been given approval by the development board to change the joint venture into a loan. We're saying all of that was false. They never intended to enter into a joint venture agreement. They didn't get approval from the development board to change the joint venture into a loan. And all of that was false and, hence, fraudulent. And if you look at paragraphs 110 through 117 of our complaint, that is the fraud, and it has nothing to do with whether or not the loan was usurious. Call it onerous, call it really high interest, but the fraud is based on the bait and switch and the eventual possession by LSOF of this property. And so we couldn't agree with defendants more. You cannot sue for what was orally under discussion before. You can't do it, we're not doing it. Lastly, as to the chart, I think the purpose of the chart on page 18 of defendant's brief is to show that somehow they never obtained the interest. We addressed that at page 15 of our reply brief, and, in fact, the $8,550,000 credit bid had to and did include the interest. I assume that was what the point was of counsel, and unless the Court has any further questions, I would submit. I don't think so. Counsel, since you're both here in the building, it's not a very nice day to walk in the gardens and chat, but you're both in the building, and I would like to encourage you to meet and confer and let us know within two or three days whether you would be interested in some assistance from the court mediation office, because it, I must say, strikes me that this is the quintessential case that could benefit from the insights of a third party. Thank you very much, counsel. We'll next hear argument in Schellenberg v. FDIC. Good morning.
judges: Browning, Magill, Rymer